May it please the Court, Counsel, Your Honors, I'm Allison Sproul, and I have the privilege this morning of representing West Texas LTC Partners, which is a company that owns and of Texas, the facility that's in question in this particular case is Cedar Manor Nursing Home located in the San Angelo area. And the issues that we're here to discuss today are whether the Administrative Law Judge or the Department of Appeals Board for the U.S. Department of Health and Human Services should have granted a motion for summary judgment against Cedar Manor if material disputed fact issues exist. And the second issue is even if summary judgment was appropriate and even if there are no disputed issues of material fact, the issue is whether the penalties were properly calculated in light of documentation provided by the State Survey Agency to the facility at the time of the second survey. And I won't spend a lot of time on the background facts of the case. The Court's been provided the briefs and the background facts have been detailed pretty specifically in the briefs. I will certainly answer any background questions that the Court may have. But just to summarize, there were two surveys in this case conducted by surveyors from the Texas Department of Aging and Disability Services. And that's significant, Your Honors, because the State surveyors are the only ones who conducted surveys in this case. They surveyed on behalf of state Medicaid regulations, federal Medicare regulations. So they basically stood in the shoes of CMS, the federal agency. There was no separate federal survey. There were no separate federal enforcement actions levied, no separate federal findings other than the findings that were made by the State Survey Agency. It's our position as set forth in our briefs that there are disputed material fact issues for both surveys. One was in December of 2013, one shortly thereafter in January of 2014. I will certainly concede that it is a much closer call on the December 2013 survey as to whether there is a material fact issue. So I don't want to focus a lot of time on that survey. I think it is much clearer for the January 2014 survey that there certainly are disputed material fact issues that precluded the summary judgment. First, it was granted by Judge Kessel, and then it was ultimately affirmed by the Departmental Appeals Board. But before I talk about the reasons that we believe there are disputed material fact issues precluding summary judgment, I want to touch briefly on the standard of review. I certainly am mindful of this Court's prior opinion several years ago in the Cedar Lake case. I believe, Judge Smith, you were on the panel that issued the Cedar Lake decision in which this Court specifically ruled that the standard of review, even under a Rule 56 case for summary judgment, if it is an agency appeal governed by the APA, that the deferential standard applies. And by deferential standard, I'm talking about abuse of discretion, arbitrary, capricious, or not supported by substantial evidence. We argued in the Cedar Lake case, as parties had argued in the Sixth Circuit, that the standard should be de novo. And again, I'm certainly mindful of the Cedar Lake opinion, but I would respectfully ask the Court to consider the arguments for why perhaps in the limited context of a summary judgment proceeding, not talking about a final after a final hearing on the merits, but strictly in the context of a summary judgment proceeding that the de novo standard should apply. We are mindful of all of the policy reasons behind applying the deferential standard following a hearing on the merits. If we've had a full trial on the merits, both parties have called witnesses, both parties have had the opportunities to cross-examine, both parties have had the opportunity to brief, both at the administrative law judge and at the departmental appeals board level, issues of fact and issues of law. Those have been thoroughly fleshed out. This Court's review, therefore, can be much more narrow. And this is one of the few types of agency appeals that comes directly from the departmental appeals board to the Circuit Court of Appeals in the case of a CMS monetary fine. We submit that perhaps de novo is the correct standard to apply instead of the deferential standard in the summary judgment context because the focus of the review in the summary judgment context, as opposed to following a hearing on the merits, is whether there exists a disputed material, issue of fact, which would require a full hearing on the merits. We don't believe that at the summary judgment level, the same level of deference should be given to agency interpretation of rules, regulations, and laws as should be given following a hearing on the merits because that's simply not the inquiry of the Court. If this were a regular appeal, a conventional appeal from a district court following a summary judgment ruling, this Court would not be ruling on the merits of the case, just as it would not be ruling on the merits of the case in an APA appeal or an agency appeal. You simply would be reviewing the evidence to determine if there is a disputed material, issue of fact, that entitles the party to a full either hearing or trial on the merits. And again, I certainly am mindful and respectful of the fact that this Court addressed this in the Cedar Lake case. The reasoning in the Cedar Lake case is because, or what the Court said in Cedar Lake, is that the deferential standard should apply because this Court defers to the agency's interpretation of its own rules. And again … Well, presuming the obvious, that, you know, our precedent guides us, what are you urging for the panel? A carve-out of that? I mean, obviously, we couldn't overrule it. So given your acknowledgment of its existence, et cetera, et cetera, what exactly in this case would you say is so unusual? I know you said it's not normal, the nature of the appeal, but why is the process itself … We're asking to carve out an exception for summary judgments, Your Honor, and that summary judgments would be subject to … If you were before an agency that incorporates Rule 56 for summary judgment practice, as the U.S. Department of Health and Human Services has done through the DAB procedures in this case, when Rule 56 has been specifically adopted, then we submit in that limited context that the standard of review should be de novo as opposed to the deferential standard. Because what we believe happens, Judge Stewart, is if you don't look at it that way, the focus is shifted. And the Tenth Circuit analyzed this back in the mid-1990s in the Olin House case. And what the Court said there is when we're talking about agency appeals, oftentimes, summary judgment is not even an appropriate vehicle to use. And there are agencies, and in the Tenth Circuit, some of the states that are … that appeal through the Tenth Circuit have adopted specific procedural rules that actually outlaw summary judgments in agency appeals for the very reason that we're advocating today, which is it essentially shifts the burden of proof. And it shifts the focus of the Court from the evidence submitted by the non-moving party, which, of course, under the longstanding U.S. Supreme Court precedent, Celotex, Matsushita, Anderson v. Liberty Lobby, any of the standard summary judgment cases, the focus should be on the evidence and whether the evidence demonstrates a genuine issue of material fact which warrants a full determination on the merits, as opposed to the deferential standard, which doesn't focus on the evidence but simply focuses on the actions of the judge. And if you focus too narrowly on the actions of the judge, I think there is at least the opportunity to lose sight of the evidence. And we believe that's what happened in this case at the board level. I mean, certainly the first level of appeal that the nursing home got before Judge Kessel, the administrative law judge, his review was de novo. But at the departmental appeals board level, and certainly we believe at this level that the Court should consider a narrow exception only in the summary judgment context to consider these de novo in line with the Sixth Circuit's decision in the Crestview case. Now, with that being said, there were two surveys here, one on December the 20th. Following the December 20th survey, monetary fines of $6,050 per day were recommended for a three-day period, and then a fine of $350 per day was ultimately recommended for, I believe, a 40-day period. Following surveys where state or federal surveyors cite deficiencies, a report is provided to the facility, and the facility submits what's called a plan of correction. When the facility submits the plan of correction, they provide the regulatory agency with a date that the corrections will be complete. The surveyors then come in on a follow-up survey, check to see was the correction complete, and if it was, then it's retroactive to the date that the facility supplied. In this case, when the surveyors came back to Cedar Manor on January the 27th, before they started the survey that they were there to do, and I believe it was an annual survey, they actually did the follow-up survey to the December issues to determine, have you cleared these deficiencies? And they determined, and I believe the document is in the record, I believe it's page 424 of the record, before they began the actual January survey, the state surveyors provided the facility documentation that the corrections were in fact completed and that the deficiencies were cleared retroactive to January 16th. This is important, Your Honors, because if you decide that there were no fact issues and that summary judgment was appropriate, we submit that the penalties were calculated improperly. The penalties were calculated improperly because once the state survey agency provided the facility noticed that the deficiencies had been cleared retroactive to January 16th, there is no evidence of a deficient practice occurring between January 16th and January 27th, January 27th being the day that the surveyor claims that she saw a nurse aide give improper perineal care to a resident, which the surveyor says caused a resident's pressure ulcer to worsen. And again, as I said, I won't spend a lot of time on the facts unless the court has specific questions, but that's the essence of the second survey. It's undisputed there was no survey between January 16th and January 27th. The deficiencies cited on January 27th occurred as a direct result of what the surveyor observed that day. Judge Kessel inferred and, in our opinion, speculated that it was reasonable to assume that there was a deficient practice that existed before January 27th. Even under the deferential standard, an administrative law judge or an agency tribunal's determination cannot be arbitrary or capricious. This court has recognized that on multiple occasions during agency appeals. For Judge Kessel to have speculated that you could infer noncompliance, that's simply not law, and it's not proper. Now, when we appealed Judge Kessel's ruling to the full departmental appeals board, the panel that we drew did not adopt Judge Kessel's ruling, which may have been improper for a different set of reasons. They found reasons that Judge Kessel had not found. They said, we don't go with what Judge Kessel said in inferring noncompliance. However, we are going to say, or hang our hats basically on the rule that if there is a conflict between the date CMS states there is compliance and the date the state survey agency states there is compliance, that the CMS finding will control. And while that's the general rule, there's one key problem with that in this case, Your Honors. There was no separate CMS finding of noncompliance between January 16th and January the 27th. There is no evidence of a deficient practice. My client has never been given notice of a deficient practice in that intervening time period, because if there had, there is a whole separate set of administrative provisions that they would go through to challenge the finding of noncompliance before they even reached the level of an appeal before an administrative law judge. That's never happened. And to infer that type of regulatory finding, use it to impose the types of fines and penalties that were imposed in this case, we believe is an absolute violation of the facility's due process rights. It is a violation of the statutes, the Social Security Act, and the federal nursing home regulations that guarantee a facility a right to a hearing on any finding of noncompliance. And that's important because the regulations reference a hearing on the finding of noncompliance, not the specific remedy. So if there was noncompliance between the 16th, after the state says we've cleared, which we have to be able to rely on, because to allow the federal agency, without sending any of their own surveyors in, to come in and cherry pick which state survey agency findings they're going to use or adopt and which ones they're not, again, even under the deferential standard, if you rely on that to impose a civil money penalty against my client, it's arbitrary, it's capricious, it's not supported by any evidence. We don't even get to substantial evidence because there is simply no evidence. So we would submit, again, that if there is a genuine issue of material fact, the penalty was not properly calculated, the penalties between January 26th and January the 27th should be overturned. We would like— You mean the 16th and the 27th? I'm sorry? You said the 26th and 27th? The 16th and 27th. I'm sorry, Judge Smith. Yes, you're correct. As far as the evidence that demonstrates an issue of material fact, Your Honors, that's contained on pages 426 through 438 of the record. Those are the affidavits of the Cedar Manor nursing staff that basically create a direct conflict between what the staff says occurred and what the surveyors say occurred. And the law from the U.S. Supreme Court and the law from this circuit is quite clear. When you have a conflict in evidence, summary judgment is absolutely not appropriate. And for these reasons, I see I'm out of time. We would ask the Court to reverse the summary judgment entered by Judge Kessel, affirmed by the Departmental Appeals Board, or in the alternative, reduce the penalty amount. All right. Thank you. You've reserved your rebuttal time. Yes, Your Honor. All right. Ms. Mendola. May it please the Court. I'm Jennifer Mendola for the respondent, the United States Department of Health and Human Services. And I'd like to start by addressing your question, Judge Stewart, about any possible carve-out with Cedar Lake. And I'd like to say that I don't believe there is a way to carve out this case from Cedar Lake. Cedar Lake involved the same agency, the United States Department of Health and Human Services, the same review process with the ALJ and the Department Appeals Board. It was also summary judgment. And it even involved one of the same regulations involving accident hazards. There's no way to distinguish what this Court has said is the proper standard for review in Cedar Lake and apply something different in this case. The facts are — the facts of how the agency process is handled, what the statute says, are identical in both Cedar Lake and in this case. That, of course, is an important hurdle for us to consider. But if we did not have that hurdle, what is your view on Cedar Lake versus the Sixth Circuit's position? Yes, Judge Smith. I believe that this Court came to the correct conclusion in Cedar Lake. I believe that this Court's adoption of the Seventh Circuit's reasoning from the Fall Meridian case is accurate. The statute — both the Medicare statute and the Administrative Procedures Act grant the agency substantial discretion in setting its own procedures and its own review process. Has the agency taken a position in opposition to the Sixth Circuit? I'm not sure. Okay. Well, that's okay if you don't know. In all of the cases I am aware of, our agency has argued that the appropriate standard of review on even when the Department of Appeals Board has granted summary judgment is the substantial evidence and arbitrary and capricious standard. Ms. Brewer makes an interesting point that doing it the way we do it in the summary judgment context arguably does reverse or upset the usual burden of proof that we have in summary judgment cases, which obviously is to — is to engage in de novo review of what the district court does. Well, and I would point out that the Department of Appeals Board conducted a de novo review of the ALJ's decision. The Department of Appeals Board's standard review in — after a full hearing before the ALJ is typically the substantial evidence standard. But when the ALJ grants summary judgment, the Department of Appeals Board does do a de novo review. So the facility has had the opportunity here for a de novo review at the administrative appeal level. And I also think it's important to look at what the facility had the opportunity to do in front of the ALJ and in front of the Department of Appeals Board. This is not a case where CMS moved for summary judgment in the first instance. Both CMS and the facility had a full opportunity to present all of its evidence, both documentary and the direct written testimony of their witnesses. It was only after all of that evidence was in the record and had been presented that CMS moved for summary judgment, at which point the facility had yet another opportunity to argue and to point out where there were alleged inconsistencies in the facts. And the ALJ and the Department of Appeals Board rightly pointed out that they didn't raise any fact issues. They raised issues of law. And I believe that if you look at the substantial evidence that supports the board's decision, you see that the decision to grant — the decision that the facility was out of compliance is supported by substantial evidence. We know that resident one and resident four were at risk for accidents from having the straps dangling near the wheels of their wheelchair. And we know that the facility was not implementing the interventions of making sure that those straps couldn't dangle. They didn't remove those accident hazards. As for the second survey with resident seven, we would submit that there is no dispute about the care that the CNA gave to the resident when providing incontinence care. The CNA's own statement was that she used five to six wipes to clean the resident's skin. The resident's care plan and the facility's own infection control policy required that she use a washcloth and soap and water. There's no dispute there that the care that was required for resident seven was not provided. I would like to turn also to the facility's allegation that there was a gap in compliance. There is no gap here. The regulations and the statute provide that once the facility has been found out of non-compliance, which they were at the December survey, the burden then shifts to the facility to demonstrate that they have achieved substantial compliance and are capable of maintaining substantial compliance. And until the facility meets that burden, CMS is authorized to continue imposing the penalties. Ms. Spruill makes the point that there's no CMS finding of non-compliance for the period January 16th through 27th. Your position is that assuming that's true, that doesn't matter. Is that right? Yes, Your Honor. Once the facility was found out of compliance from the December survey, it was their obligation to come forth with evidence that they had achieved substantial compliance. And the Board has been very clear that achieving substantial compliance does not just mean clearing previous deficiencies. It means demonstrating that you were in compliance with all of the Medicare requirements and, importantly, that you are capable of maintaining substantial compliance. And I think that it's telling in this case that on that revisit survey, which was in part to determine whether the previous deficiencies had been cleared, but also to look at other situations that might have arisen in the facility, they did find additional non-compliance. So I think it is entirely clear that there's substantial evidence that the facility did not meet its burden of showing that it could maintain substantial compliance, because it didn't maintain that compliance. The undisputed facts in this case are that the facility did not provide the care and services necessary for Resident 1 and Resident 4 regarding making sure that the straps of their Hoyer lift sling could not become entangled in their wheelchair wheels. It's undisputed that even after Resident 1 suffered an accident that broke both of his legs, surveyors still saw throughout the facility with straps dangling near her wheels where she could fall. It's undisputed that the CNA providing incontinent care to Resident 7 did not follow the resident's care plan or the facility's own infection control policy when she used wipes to clean the resident's skin instead of soap and water, and that when she didn't change her gloves. And it's undisputed that the facility came forward with no evidence whatsoever that they had achieved substantial compliance and that they were capable of maintaining substantial compliance between the survey dates. If the panel has no further questions, I'd be... What did you say about the penalties? What's your... Counsel opposite has argued that the penalties were inappropriately calculated, etc. What's your... The facility's argument is that because there was a period of days between the clearing of the deficiencies from the December survey and the start date of the deficiencies for the second survey, that CMS had no legal basis to impose the denial of payment for new admissions or the CMP for those dates. And our position is that it was the facility's compliance, which the board has held is not the same thing as merely clearing previous deficiencies. And it also includes coming forward with evidence that you are capable of maintaining substantial compliance. So it's what Chief Judge Stewart is asking about, about the penalties. That's the same issue that you were talking about a minute ago about the alleged gap in time. Yes, Your Honor. We believe there is no gap because CMS was entitled to to impose penalties from the first day of non-compliance until the facility demonstrates. How do the regulations expressly say that? In other words, where the facility knows that once the survey has occurred and deficiencies have been noted, it then spells out or says having to obtain and maintain the compliance? Yes, and those are in two separate sections of the regulation depending on the type of remedy. The first is in 42 CFR 488.454 and the other is in 488.440. It's also, the board has made clear in many of its decisions that it is the facility's burden to come forward with the evidence they have achieved substantial compliance and are capable of maintaining substantial compliance. I'd also note that this court, in an unpublished decision in Mississippi Care Center, applied a similar rationale to the computation of how long the immediate jeopardy determination was imposed. That once CMS had determined that there was immediate jeopardy and the facility disputed when the immediate jeopardy was abated, it was the facility's burden to come forward with evidence that the immediate jeopardy had been abated, not CMS's burden to come forward with evidence that it remained. Right, I ask that because part of her final argument, well not final argument, but just as she ended up was alleging that West Texas's due process rights were violated vis-a-vis the findings of non-compliance and that's why I wanted to hone in on whether or not the CFRs or the other regulations expressly do say once the survey finds X, then Y, etc., etc., so to the due process argument. And yes, we believe that both the regulations and the board's longstanding case law put the facility on notice that it was their burden to come forward with evidence. And they came forward with no evidence in this case. The only evidence that they point to is the state sheet that says the three deficiencies from December have been cleared. But that's, first CMS is allowed to disagree with that decision and when CMS disagrees with the decision, the regulation provides it CMS's decision controls. And second, that's only part, even if CMS were bound by that state finding, that's only part of the question because clearing previous deficiencies does not necessarily mean that you have attained substantial compliance and it does not mean that you have shown that you are capable of maintaining substantial compliance. How is that, is that showing made through some procedure or process wherein the nursing home puts on evidence, etc., etc., or is it, you know, a series of how would one carry that, you know, that burden? Is it invoking a procedure where the agency's called in and you say, okay, here's all that we've done, body, body, body, or is it, you know, through the affidavits or is it, okay, come back and inspect us, we've now done all this. I'm just curious, how is it, what's the process for showing the obtaining, maintaining? Yes, Your Honor, I believe that would vary based on the facts of the nature of the noncompliance, but the facility could certainly demonstrate it, I mean, through the findings of the revisit, they could potentially submit evidence to the ALJ regarding their, you know, their training, they could submit perhaps I would say in this instance, if it's the violations pertain to the particular workers here who, you know, didn't follow the, they came and said, okay, it was employees A, B, and C, who we don't admit, but you say violated, they've been terminated, they're no longer here, they're new hires, would that be a way of demonstrating in part facially compliance because those who were deemed to have violated are no longer there? That certainly could be something the facility could come forward with, and in this case, the facility came forward with no evidence that they had achieved substantial compliance or were capable of maintaining substantial compliance, and again, I do think it's important to note that they were, at that revisit survey, surveyors found additional, three more instances of noncompliance, which I think demonstrates that the facility had not or would not have been capable of showing that it was capable of maintaining substantial compliance at that point. If the panel has no further questions, I'll cede the rest of my time. All right, thank you. All right, back to you, Ms. Brewer. Now, help me understand, putting aside for the moment the argument we had, you know, on direct about the standard and the carve-out, putting that aside, but just help me understand succinctly exactly what you're saying the disputed issues of fact are, given council option, at least what I read in the briefs, it seems that, you know, there really wasn't a dispute about whether, you know, the patient's care, the wheelchair, all those incidents in there, I didn't gather that there was, so, you know, they say, well, what you're making basically are legal. So, you know, one, two, three, you know, what are the disputed facts that you're saying, not whether the ALJ or somebody properly viewed it, under what standing, but I mean, precisely what are you saying are the critical disputed facts that have not yet been discerned? The disputed facts for that particular survey, Your Honor, we outlined by bullet points on page 25 of our brief, but I will succinctly state them for you right here. It comes down to one basic issue that I could rephrase in about 15 different ways, and that's what I did in the brief, was the supervision and assistance provided to the resident in the wheelchair reasonable? Was it adequate? This court has recognized, going back to the Donaldson case in 2009, that the issue of reasonableness is a fact issue that precludes summary judgment. That's the issue with the, the crux of the issue with the December survey, the issue with the January survey. Two, one, was the nurse aide competent in resident care tasks? That's one issue. We cited to the case of maybe healthcare center versus CMS, which says if the deficiency is cited at a level which constitutes no actual harm, which is the level that was cited in this case, and the nurse aide is certified by the state, then competency is assumed. Summary judgment would not be proper. The other issue is under the tag or the citation pertaining to pressure ulcers, whether the facility provided proper treatment to prevent the development of additional pressure ulcers, because this was a resident who had been at this facility off and on for eight years, various points in time, was admitted with pressure ulcers, continued to develop pressure ulcers throughout this eight-year period because of a whole host of medical conditions, diabetes, prior stroke, bed-bound, spinal stenosis, peripheral vascular disease, and so on and so forth. Vascular disease, a whole host of conditions that contribute to the unavoidable nature of developing a pressure ulcer, and the issue here is was the treatment provided to the resident sufficient to prevent the resident from developing an additional pressure ulcer? The surveyor says no. Our director of nursing says yes. This is no different than if we had a traditional medical malpractice case where we had two experts or two fact witnesses who were qualified to give an opinion on a competing issue. One says, I believe there was a violation of the standard of care. The other one says no. Your Honor, that's the essence of a fact issue, and for the January survey, we outlined the fact issues by bullet point on pages 30 and 31 of our brief. And, Your Honor, I would like to — On your — I'm sorry. On your — the point that you — I'm sorry, Judge Smith. I was having a little — The point that you raise about the standard of review in light of Cedar Lake, Ms. Mendola points out that Cedar Lake was also a summary judgment case. It was. And Cedar Lake, interestingly enough, Your Honor, and there are a variety of reasons that cases once decided by this Court either do or do not come back before you want a motion for rehearing or do or do not get appealed further, client wishes, client desires. But Cedar Lake highlights the problems with the summary judgment, because if you recall from Cedar Lake, there were actually two different ALJs in that case. The first one — Well, my point is more to sort of our rule of orderliness that we — you know, we follow prior opinions. And if, in fact, Cedar Lake — you both agree it was a summary judgment case, so I — it makes it harder even if we decide — I'm not saying we would want to or not. If we wanted to carve that out, I'm not — I don't really know how we could do that, because that was a summary judgment case. Yes, Your Honor. And I think as high of a mountain as it is for me on behalf of my client to climb, if there is a good-faith argument for why this Court should revisit an issue, whether it be a change in the law of this circuit, a development of the law in other circuits — and I believe that law has been developed in other circuits, since the Cedar Lake opinion — Well, we would — I'd — excuse me, I don't mean to cut you off, but you're running short on time, so — Yes, sir. — just the — we would have to go in bank, it seems to me, to do that rather than figuring out that, well, Cedar Lake didn't really cover that issue. Unless you found that Cedar Lake was — that the rationale for what existed in Cedar Lake does not necessarily exist in this case, because Cedar Lake basically adopted Judge Posner's reasoning from the Seventh Circuit in Fall Meridian as opposed to the Sixth Circuit in Creston Park. And if the circuit took — if this Court took another look, that the analysis there — it's one paragraph, one headnote. It's not that detailed. It doesn't go into the level of analysis that the Sixth Circuit in the Creston Park case went into. And I believe the Court does have the authority to do that. Again, I recognize I am climbing a very high mountain in even suggesting that you attempt to do this. One thing, if I may, Your Honor — And it's a fair point that you raise, so — Yes, sir. Yes, sir. And as I said, I am certainly mindful of the Cedar Lake opinion, and you were on the panel in that opinion, and I'm very respectful of that. But the one last thing, if I may, and I realize I'm out of time, but if I may, one final point, Your Honors. This issue of substantial compliance versus clearing deficiencies, it's a distinction without a difference. The only people who are authorized to come into Cedar Manor Nursing Home or any nursing home in the country are surveyors. Surveyors dictate compliance or noncompliance. The surveyors came into Cedar Manor in December and said, you're out of compliance. The evidence, Judge Stewart, that you asked about where would the facility bring forth this evidence, the facility brings forth the evidence in the plan of correction. And when you go back before you render your opinion, take a look at the statement of deficiencies. It's a two-column form, and on the right side is the facility's plan of correction. And one of the things the facility must, by law, highlight in the plan of correction is what they plan to do to achieve continued compliance. And then they provide a date by which compliance will be achieved. That was done here. It was accepted by the state. CMS never disagreed with the state. They never provided Cedar Manor notice that they disagreed with the state. So we convince words all day long, but again, Your Honors, it's a distinction without a difference. When the state gave Cedar Manor that piece of paper that said these deficiencies have cleared as of December 16th, Cedar Manor was entitled to rely on that. They had access to every single regulation, every single record, every single piece of paper, every single going on in that nursing home to say, are you out of compliance in another area? And there is not one shred of evidence that they were out of compliance between January the 16th and January the 27th. The second survey was based on a personal observation on January 27th, nothing sooner. There is no evidence. It can't support the penalty. And if the summary judgment stands, we would ask that the penalties be rescinded or reduced. All right, thank you, ma'am. We appreciate your argument and the responses to the panel's questions. And thank you, Mendoza. Case will be submitted. We'll take a close look at the record as